AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

ONE APPLE IPHONE AND ONE ANDROID FLIP PHONE CURRENTLY
IN POSSESSION OF THE METROPOLITAN POLICE DEPARTMENT
EVIDENCE CONTROL BRANCH LOCATED AT 17 DC VILLAGE LANE
SW, WASHINGTON, D.C. 20032, UNDER RULE 41

)
)
)
)
)
)

Case No. 25-sw-118

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the _____Jurisdiction_____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Darius J. Terry, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:  ___04/29/2025___

_____
*Judge's signature*

City and state:  ___Washington, D.C.___

Moxila A. Upadhyaya, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original    ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

ONE APPLE IPHONE AND ONE ANDROID FLIP PHONE CURRENTLY IN POSSESSION OF THE METROPOLITAN POLICE DEPARTMENT EVIDENCE CONTROL BRANCH LOCATED AT 17 DC VILLAGE LANE SW, WASHINGTON, D.C. 20032, UNDER RULE 41

)
)
)  Case No.  25-sw-118
)
)
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _____Columbia_____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before  May 13, 2025                *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  Moxila A. Upadhyaya, U.S. Magistrate Judge
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of  _____ .

Date and time issued:   04/29/2025

City and state:   Washington, D.C.

Moxila A. Upadhyaya, U.S. Magistrate Judge
*Judge's signature*

Moxila A. Upadhyaya, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  25-sw-118 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is an Apple iPhone with case cracked, bearing Metropolitan Police Department barcode 11248213 ("TARGET DEVICE-1"). TARGET DEVICE-1 is currently stored in evidence the Metropolitan Police Department Evidence Control Branch located at 17 DC Village Lane SW. Washington, D.C. 2003

**ATTACHMENT A-2**

*Property to Be Searched*

The property to be searched is an Android flip phone, bearing Metropolitan Police Department barcode 11248213 (TARGET DEVICE-2").  TARGET DEVICE-2 is currently stored in evidence the Metropolitan Police Department Evidence Control Branch located at 17 DC Village Lane SW. Washington, D.C. 20032.

## ATTACHMENT B

*Property to be seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 922(g)(1), Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, (the "TARGET OFFENSE"), as described in the search warrant affidavit, including, but not limited to, call logs, phone books, voicemail messages, text messages, photographs, images and video, Global Positioning System data, and any other stored electronic data:

a.  Establishing or documenting the commission of the TARGET OFFENSE;

b.  Identifying locations where the individual committed the TARGET OFFENSE, traveled to before and after the commission of the TARGET OFFENSE, and in preparation for the TARGET OFFENSE;

c.  Reflecting the ownership and use of the items identified in Attachment A by the individual committing the TARGET OFFENSE;

d.  Documenting meetings and communications between individuals committing one or more of the incidents that constitute the TARGET OFFENSE;

e.  Reflecting communications between the individual committing the TARGET OFFENSE or other individuals and other individuals, discussing the TARGET OFFENSE;

f.  Reflecting communications between the individual committing one or more of the incidents that constitute the TARGET OFFENSE and other individuals who may have assisted or provided support in the commission of the TARGET OFFENSE;

1

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSE, to include photographs or videos of firearms, firearms parts, or ammunition;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of firearms, firearms parts, or ammunition;

i.  Reflecting the state of mind of the subject and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

j.  Any records and information relating to firearms, firearms parts, or ammunition, including purchasers and suppliers of firearms, firearms parts, or ammunition;

k.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSE;

l.  Evidence of who used, owned, or controlled the Devices at the time things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

m.  Evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

2

n.  Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

o.  Evidence of counter-forensic programs (associated data) that are designed to eliminate data from the Devices;

p.  Evidence of the times the Device was used;

q.  Passwords, encryption keys, and other access devices that may be necessary to access the Devices;

r.  Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Devices;

s.  Records of or information about Internet Protocol addresses used by the Device; and

t.  Records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF
ONE APPLE IPHONE AND ONE
ANDROID FLIP PHONE CURRENTLY IN
POSSESSION OF THE METROPOLITAN
POLICE DEPARTMENT EVIDENCE
CONTROL BRANCH LOCATED AT 17 DC
VILLAGE LANE SW, WASHINGTON,
D.C. 20032, UNDER RULE 41**

**SW No. 25-SW-118**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Darius Terry of the Bureau of Alcohol, Tobacco, Firearms and Explosives

("ATF"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property, specifically

two digital devices: Apple iPhone with case cracked, as described in Attachment A-1 ("TARGET

DEVICE–1"); and an Android flip phone, as described in Attachment A-2 ("TARGET DEVICE–

2") (collectively, the "TARGET DEVICES"), for the things described in Attachment B. The

TARGET DEVICES are currently in possession of the Metropolitan Police Department Evidence

Control Branch located at 17 DC Village Lane SW, Washington, D.C. 20032, and both are being

stored under the same Metropolitan Police Department barcode number: 11248213.  Such a search

would include an examination of the seized device for information described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was

made, that statement is described in substance and is not intended to be a verbatim recitation of

1

such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.    Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.    I, Darius J. Terry, have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since July 2023. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Specifically, I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since July of 2023. I am presently assigned to the Washington D.C. Field Office. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy. My training at the academy included formalized instruction in, among other things, drugs, firearms, violent crime-related investigations, drug identification and detection, interdiction, familiarization with United States drug and firearms laws, financial investigations and money laundering, identification and seizure of drug and firearms tracking related assets, physical and electronic surveillance, weapon qualification and tactics, operation and use of confidential informants, and undercover operations.

5.    As an ATF Special Agent, I have participated in federal investigations involving the distribution of controlled substances, theft, and robbery. I have participated in physical

surveillance operations and in the execution of federal search warrants, including those involving multi-state criminal activity.

6.      Before joining the ATF, I was a law enforcement officer for the Virginia State Police (VSP) from June 2011 to July 2023.  From April 2017 to July 2023, I worked narcotics investigations.  Your affiant has participated in numerous narcotic arrests and has drafted affidavits in support of search warrants that have led to the arrest of numerous defendants and the recovery of crucial evidence.  Your affiant has also received on-the-job training in the areas of drugs and narcotics enforcement.

7.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for violations of Federal law.  As an ATF Special Agent, I am authorized to execute warrants issued under the authority of the United States.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all my knowledge, or the knowledge of others, about this matter.

9.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that Rhondell WILLIAMS ("WILLIAMS") has committed violations of 18 U.S.C. § 922(g)(1), Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, (the "TARGET OFFENSE"). There is also probable cause to search the TARGET DEVICES, further described below and in Attachments A, for the things described in Attachment B.

## IDENTIFCATION OF THE DATA TO BE EXAMINED

10.     The property to be searched is the black Apple iPhone with a cracked screen protector, bearing Metropolitan Police Department barcode 11248213 ("TARGET DEVICE-1") which, as described below, was located in WILLIAMS' right hand at the time police initially stopped WILLIAMS and then fell to the ground.

11.     TARGET DEVICE–2 is an Android flip phone, as described and depicted in Attachment A-2, bearing Metropolitan Police Department barcode 11248213 ("TARGET DEVICE-2"). The device was located in WILLIAMS' left hand at the time police initially stopped WILLIAMS and then fell to the ground.

12.     The TARGET DEVICES seized are currently in possession of the Metropolitan Police Department Evidence Control Branch located at 17 DC Village Lane SW, Washington, D.C. 20032.

## PROBABLE CAUSE

13.     On April 4, 2025, Metropolitan Police Department (MPD) Violent Crime Suppression Division (VCSD) Robbery Suppression Unit (RSU) officers were working the evening tour of duty. Sergeant (Sgt.) Possinger, Sgt. Wershbale, and Lieutenant (Lt.) Steen were traveling southbound in the 2600 block of Martin Luther King Jr Avenue SE, Washington, D.C. 20020. While passing Pomeroy Road SE, Lt. Steen observed Rhondell WILLIAMS, DOB: 3/27/1987 standing in the 2800 block of Pomeroy Road SE and noticed that he was holding an open glass bottle.

14.     Investigators then turned around and drove into the 2800 block of Pomeroy Road SE. Once in the 2800 block of Pomeroy Road SE, Sgt. Possinger observed WILLIAMS holding an open glass bottle of what appeared to be tequila in his hands while he was walking. Investigators

exited their vehicles and went to stop WILLIAMS who sat down on the front steps of 2818 Pomeroy Road SE. As Sgt. Possinger made contact with WILLIAMS, the open bottle of tequila was observed underneath his leg while he was sitting on the steps. Sgt. Possinger instructed WILLIAMS to walk down the steps so Investigators could speak with him. As WILLIAMS walked down the steps, WILLIAMS was holding both TARGET DEVICES in his hands.



*Figure 1: TARGET DEVICE-1 & TARGET DEVICE-2 IN WILLIAMS' HANDS*

15.    Once at the bottom of the building front steps, Sgt. Possinger placed WILLIAMS in handcuffs. WILLIAMS dropped both TARGET DEVICES on the steps of 2818 Pomeroy Road while being stopped by Investigators.



***FIGURE 2: TARGET DEVICES ON STEPS***

16.     Investigators then attempted to walk WILLIAMS away from his family members who were gathering close by and were becoming confrontational towards law enforcement. WILLIAMS then locked out his legs and went limp. Sgt. Possinger and Lt. Steen then had to drag WILLIAMS away from his family members. Due to WILLIAMS' actions, Sgt. Possinger advised other members on scene that WILLIAMS was under arrest for Possession of an Open Container of Alcohol. During a search incident to arrest, Sgt. Possinger located a crossbody bag that was under WILLIAMS' partially zipped up hooded jacket.

After WILLIAMS was placed in handcuffs, Sgt. Possinger went and retrieved the TARGET DEVICES and the open bottle of tequila from the steps of 2818 Pomeroy Road. The liquid inside of the bottle emanated an odor of an alcoholic beverage.



*FIGURE 3: Recovery of TARGET DEVICE-2 (Android)*



*FIGURE 4: Recovery of TARGET DEVICE-1 (Apple iPhone)*

17.    Inside of the crossbody bag, Sgt. Possinger located a firearm and voiced the predetermined codeword for the presence of a firearm to other investigators on scene. The firearm was subsequently recovered, and WILLIAMS was transported from the scene to the 7th District for criminal processing.



***FIGURE 5: firearm***

18.    A technician from the District's Department of Forensic Sciences processed the recovered pistol at the Violent Crime Suppression Division. WILLIAMS' firearm was a Polymer 80 "ghost gun" 9mm semi-automatic pistol, with no serial number and was loaded with no round in the chamber and 5 rounds in a 10-round capacity magazine The recovered handgun appeared

fully functional, was capable of being fired with the use of a single hand, was designed to expel a projectile by means of an explosive action and had a barrel length of less than twelve inches.

19.     A law enforcement query revealed that WILLIAMS does not possess a permit to carry a firearm in Washington, D.C. Additionally, Sgt. Possinger discovered that WILLIAMS was previously convicted of Unlawful Possession of a Firearm out of the Superior Court for the District of Columbia (Docket #2017CF2013226) by the Honorable Kimberley Knowles and was sentenced to 24 months of incarceration. As the recovered firearm is a privately manufactured handgun with no serial number, it is unable to be registered in the District.

20.     On April 17, 2025, a District Court grand jury returned an indictment in case 21-cr-25 (LLA) charging WILLIAMS with the following offenses:

a.  Count 1: Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

b.  Count 2: Unlawful Possession of a Firearm (Prior Conviction), in violation of 22 D.C. Code § 4503(a)(1).

c.  Count 3: Possession of a Prohibited Weapon (Felony), for possession of a "ghost gun" with an enhancement for a prior felony conviction, in violation of 22 D.C. Code §§ 4514(a), (c)(1), and (c)(3).

14.     There are no firearms or ammunition manufacturers in the District of Columbia. Therefore, there is probable cause to believe the ammunition in this case travelled in interstate commerce. All of the aforementioned events occurred within the jurisdictional limits of the District of Columbia.

17.     Your affiant is aware that it is unlawful for any person who has been convicted in

9

any court of a crime punishable by imprisonment for a term exceeding one year to possess a firearm or ammunition under 18 U.S.C. § 922(g)(1).

## THE TARGET DEVICES

18.     The TARGET DEVICES are currently in lawful possession and are stored by the Metropolitan Police Department Evidence Control Branch located at 17 DC Village Lane SW, Washington, D.C. 20032. The TARGET DEVICES were in WILLIAMS' hands at the time of police stopped him and were then recovered from the ground.

19.     Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to criminal activity.  Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communications with others often include communications that shed light on the cell phone user's location and activity during a particular time period.  For instance, in this case, should the Defendant suddenly claim he was on his way to deliver the firearm to law enforcement, his communications and location activity would be critical as evidence disputing or supporting the claim.  Similarly, location evidence on his phone would similarly be able to tie him to the firearm itself, which was found in his flight path.

20.     Your affiant knows that people who possess firearms like to take pictures of themselves with firearms or prove ownership or possession of a particular firearm to their friends. They will use a camera, cell phone with a camera, tablets with a camera and/or personal computers to photograph and store photographs of firearms or themselves holding the firearm and other

criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal gun possession. Moreover, cellphones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information. In this case in particular, WILLIAMS would have had to illegally buy or purchase the firearm (illegally as his multiple convictions should have prevented him from buying the firearm legally). Thus, communications and photos or videos related to his purchase of the firearm are likely to be on his phone – as he would be unable to purchase it legitimately and would have had to purchase it from someone he knows.

21.     In summation, the execution of a search warrant on the TARGET DEVICES would allow law enforcement to, among other things: (i) identify communications relating to the possession of firearms and communications evidencing the firearms relationship between parties; (ii) provide contact information regarding potential suppliers, customers, and distributors of firearms; (iii) identify meeting locations for the potential commencement of firearms transactions or acquisition of firearms; and (iv) identify photographs of firearms and firearms paraphernalia (such as parts, magazines, and ammunition). Additionally, evidence from the TARGET DEVICES may yield ownership information, as well as evidence connecting (or not connecting) WILLIAMS to the seized contraband. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSE by WILLIAMS.

## **TECHNICAL TERMS**

22.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

12

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location,

13

and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital forms. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static, that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.    "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.   This is done by establishing a virtual point-to-point connection through the use of dedicated connections,

encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it, but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

        q.    "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

        23.    Based on my training, experience, and research, I know that cell phones often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or

used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigations.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

24.    As described above and in Attachment B, this application seeks permission to search for the TARGET DEVICES for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICES, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET DEVICES for at least the following reasons:

a.    Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to criminal activity.  Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.

b. Your affiant knows that people who possess firearms like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends.  They will use a camera, cell phone with a camera, tablets with a camera, and/or personal computers to photograph, and store photographs of firearms or themselves holding firearms and other criminal

activity that they may be involved in.  These pictures or videos are excellent evidence of illegal gun possession.  Moreover, cell phones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms for purchase, with accompanying price information.  I know that people who possess guns, unlawfully obtained money, and other contraband in the Washington, D.C. metropolitan area, often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos."

c.      Cell phones used by possessors of illegal firearms contain valuable information and evidence relating to their possession of firearms.  Such information consists of, but is not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. Such information can allow law enforcement to, among other things: (i) identify communications relating to the possession of firearms and communications evidencing the firearms relationship between parties; (ii) provide contact information regarding potential suppliers, customers, and distributors of firearms; (iii) identify meeting locations for the potential commencement of firearms transactions or acquisition of firearms; and (iv) identify photographs of firearms and firearms paraphernalia (such as magazines and ammunition).

d.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

e.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via

the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

25.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I

respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the TARGET DEVICES at issue here because:

      a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

      b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs,

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

26.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often-requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and it can require substantial time.

d.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smartphones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by

forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smartphones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running iOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smartphones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

     f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, Your Affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

     27.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

     a.    Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICES to an appropriate law enforcement laboratory or similar facility for review. The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

     b.    The analysis of the contents of the digital devise may entail any or all of the various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed

to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

           c.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Devices will be specifically chosen to identify the specific items to be seized under this warrant.

<u>**CONCLUSION**</u>

28.    Your Affiant respectfully submits that this affidavit supports probable cause for a warrant to search the TARGET DEVICES contains evidence of the TARGET OFFENSE.

29.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

30.    I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICES are under the control of law enforcement.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Respectfully submitted,

_____
Darius J. Terry
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 29, 2025.

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE